**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| YVETTE HEINTZELMAN, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| WEISS & COMPANY LLP, DANIEL A. | ) |
| FORTMAN, individually, and STEVEN C. | ) |
| GOLDBERG, individually, | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

Plaintiff, Yvette Heintzelman, ("Heintzelman" or "Plaintiff"), by her attorneys, Daniel V. Kinsella, Clark Hill, PLC, Chicago, Illinois complains of Weiss & Company, LLP, Daniel A. Fortman, ("Fortman") a partner, individually, and Steven C. Goldberg ("Goldberg"), a partner, individually, (together referred to as the "Individual Partners") as follows:

1.      This is an action for accountant's malpractice against Weiss & Company LLP based upon Ms. Heintzelman's position as an equity partner at Clark Baird Smith, LLP ("CBS") a law firm doing business in Rosemont, Illinois.  She was an equity partner from on or about September 1, 2010, through June 30, 2021.

## PARTIES

2.      Heintzelman, is a resident of Polk County, Wisconsin, and was a founding equity partner of CBS in 2010.  Heintzelman remained an equity partner at CBS from 2010 until June 1, 2021.

3.      Weiss & Company LLP ("Weiss") is a limited liability partnership with its principal place of business in Glenview, Illinois.

1

4.      Weiss has 13 partners:  Dennis W. Anderson, a citizen and resident of the Village of Grayslake, Lake County, Illinois; Howard M. Bloom, a citizen and resident of the Village of Glenview, Cook County, Illinois; Christopher S. Bozarth, a citizen and resident of the Village of Northbrook, Cook County, Illinois; Katherine Chung, a citizen and resident of Glenview, County of Cook, State of Illinois; Mark M. Dubinski, a citizen and resident of the Village of Palatine, Cook County, Illinois; Daniel A. Fortman, a citizen and resident of the Village of Glenview, Cook County, Illinois; Eve Fugiel, a citizen and resident of the Village of Prospect Heights, Cook County, Illinois; Steven C. Goldberg, a citizen and resident of the Village of Northbrook, Cook County, Illinois; Steven R. Goluch, a citizen and resident of the Village of Inverness, Cook County, Illinois; Lisa Hahm, a citizen and resident of the Village of Glenview, Cook County, Illinois; James L. Hamilton, a citizen and resident of the Village of Northbrook, Cook County, Illinois; Jeremy Morgan, a citizen and resident of the Village of Palatine, Cook County, Illinois; Lawrence J. Sexauer, a citizen and resident of the Village of Palatine, Cook County, Illinois.

5.      The Individual Partners are both Certified Public Accountants in the State of Illinois.  As stated above, both are citizens and residents of Cook County, State of Illinois.

**JURISDICTION AND VENUE**

6.      Jurisdiction is proper in this Court under 28 U.S.C. § 1332 in that Plaintiff is a citizen and resident of the State of Wisconsin and Defendant has its principal place of business in the State of Illinois and all of Defendant's partners are citizens and residents of the State of Illinois. The amount in controversy exceeds $75,000.

7.      Venue is proper in this Court under 28 U.S.C.  § 1391(b)(1) and (b)(2) in that Weiss's principal place of business is in the State of Illinois, County of Cook and all of Weiss's

CLARKHILL\L5754\462236\271599094.v1

partners are residents of the Northern District of Illinois and a substantial part of the events or omissions giving rise to the claim occurred in the Northern District of Illinois.

## FACTUAL BACKGROUND

8.      In 2010, Weiss was hired by the law firm of Clark Baird & Smith ("CBS") to perform accounting, controllership and tax services for CBS.

9.      Plaintiff, Yvette Heintzelman, was an equity partner at CBS through June 30, 2021, and a member of both the Executive Committee and the Compensation Committee of CBS until her resignation.  In that role, Heintzelman participated in the management decisions of the firm through her participation in the Executive Committee including meetings concerning Net Profit calculations resulting in Net Profit allocations to the partners at the end of each fiscal year.  As part of that process, Heintzelman received internally prepared income statements and financial documents to assist her and the other Executive Committee members in making financial decisions for the partnership.   These decisions included seeking loans under the Paycheck Protection Program, retaining staff during COVID, and compensation decisions.  In addition, before being voted in as a member of the Executive Committee, Heintzelman was an "ex officio" member of the Executive Committee since September 1, 2020.   In that position, she relied on the income statements, books, and records provided by Weiss in the execution of her duties in that role and as a partner in the firm, including hiring staff, hiring attorneys, capital improvements, income partner decisions, and equity partner decisions.

10.      CBS is a management-side labor and employment law firm.  It generates revenues by recording and billing for the time an attorney performs for work on a client matter.  That time is memorialized in various accounting applications called Amicus and P.C. Law.  Fees are earned

3

at the time the work is performed. CBS billed its clients generally every month. On the first few days of a month, CBS generates a pre-bill which is a draft of the bill for legal services for the previous month's work. The pre-bill was reviewed by the partner responsible for the client's matter. The partner reviews the pre-bills and then sends them to legal assistants to finalize and send to the clients. This pre-bill process generally takes place in the first two weeks of the month. By way of example, work performed in July 2020, was contained in a pre-bill generated in August 2020 reviewed, and mailed out in August 2020.

11.     The CBS Partnership Agreement was drafted by Stephen Golan of the law firm of Golan & Christie who was a former partner of R. Theodore Clark, Jr., James Baird, and Robert Smith when they all worked together at Seyfarth Shaw. At all times, Smith was the Managing Partner of CBS and had day-to-day day control of the firm's finances and management decisions. Clark, Baird, and Smith, at all relevant times, had controlling ownership interests under the terms of the partnership agreement.

12.     The Weiss & Co website provides:

A CPA firm is only as good as its people, and in that regard, Weiss & Company LLP is second to none, with a team whose collective credentials and experience rival those of any accounting firm in the Chicago area. All of our partners are members of both the American Institute of Certified Public Accountants and the Illinois CPA Society, and we have consistently met the requirements for AICPA's Peer Review Program since 1993.

https://weisscpa.com/team/

13.     George Bernstein, ("Bernstein"), is a Senior Manager in the Controllership Services group that is housed in the assurance services division (audit, reviews, compilations, write-up/bookkeeping) of Weiss. In his Weiss biography, Bernstein is presented as an outside controller

CLARKHILL\L5754\462236\271599094.v1

professional with prior controller positions in the industry. Under the AICPA definitions, his controller services are classified as Consulting Services.

14.     Weiss provided CBS with Accounting Services and Controllership Services. On its website, Weiss describes its Accounting Services as:

> Weiss offers a broad range of cost-effective accounting services designed to keep your business running efficiently and effectively. From simple projections to complex financial modeling, our experienced staff can deliver the data and guidance you need to achieve your company's financial goals. A sampling of our services: Bookkeeping; Payroll; Tax compliance; Cash flow and budget analysis; Financial statement preparation; Financial forecasts and projections; CFO and controller services; Accounting software selection; Business consulting and Business valuations.

On its website, Weiss describes its Controllership Services as:

> Our staff of CPAs can provide you with a full range of controllership services, including strategic planning, budgeting and forecasting, and financial analysis. We're ready to dig in deep to understand your business and work with you to create a unique, customized service that meets your business's needs. Available services include Preparing financial statements; conducting trend analyses; Developing financial metrics and KPIs; Creating cost reduction strategies; Managing invoices and bill payments; Developing compliance reports; Reconciling bank statements and month-end activities; Prepare audits and review internal controls; and Supporting onsite accounting staff. (https://weisscpa.com/what-we-do/controllership-services/)

Bernstein provided both controllership services and Chief Financial Officer (CFO) services to CBS and its partners including Heintzelman since at least 2011.

15.     Specifically, Weiss' controllership services included but were not limited to directing CBS accounting staff in specific postings to CBS' general ledger. Weiss provided material instructions to CBS's internal accounting staff in correcting its postings to its general ledger used to report income to the partners. For example, in the document entitled Clark Baird Smith LLP 2021 General Ledger, January 1 to December 31, 2021 (CBS 00264-002780), there are

several adjusting journal entries, at least 30 adjusting journal entries ("AJEs") were identified with the description "per George".

16.     These AJEs touched every account category of the CBS general ledger including accounts relating to assets, liabilities, revenues, expenses, and partner equity, allocations and capital accounts.  As such, Weiss was directly responsible for the maintenance of the accounting records it used to prepare CBS' annual IRS form 1065 and related partner K-1 returns filed for the years 2010 through 2021.

17.     Upon information and belief, Bernstein did not provide Compilation services and did not create a Compilation Report,

18.     Steve Goldberg is a partner of Weiss and provided tax services to CBS and Heintzelman.

19.     The AICPA Code of Professional Conduct sets forth General Standards that apply to all members in any professional service they render; they are:

    a.  **Professional Competence**. Undertake only those professional services that the member or the member's firm can reasonably expect to be completed with professional competence.

    b.  **Due Professional Care**. Exercise due professional care in the performance of professional services.

    c.  **Planning and Supervision**. Adequately plan and supervise the performance of professional services.

    d.  **Sufficient Relevant Data**. Obtain sufficient relevant data to afford a reasonable basis for conclusions or recommendations in relation to any professional services performed.

(https://pub.aicpa.org/codeofconduct/ethicsresources/et-cod.pdf )

6

20.     The AICPA Code requires members to provide professional services with Integrity, Objectivity,  and in support of the Public Interest.

21.     Bernstein was required to follow the AICPA  Statement of Standards for Consulting Services. Weiss should have had two contracts with CBS: (1) a contract for Controllership Services, and (2) a separate contract for Tax Preparation. The partner in charge of the controllership practice is the managing partner, Daniel Fortman, and the tax returns were signed by Steven Goldberg (https://weisscpa.com/team/steven-c-goldberg/).

22.     Upon information and belief, there was no recognized or formal divisions of duties between the controller duties and the tax preparation duties Weiss performed for CBS.  Bernstein was involved in the preparation of the CBS  partners' K-1 and the CBS partnership tax return (IRS Form 1065).   Bernstein responded to questions regarding Heintzelman's K-1s and the CBS withholdings and payment of state taxes on behalf of a nonresident partner.

23.     Further, Weiss and Bernstein prepared Plaintiff's tax returns and Goldberg signed them.

24.     Despite the very clear language in the Partnership Agreement, CBS' books were not elected not to maintained its books on the accrual basis of accounting. Instead, the books were cobbled together using a unique recognition of revenues and expenses that is neither accrual nor cash. It is characterized by the Financial Accounting Standards Board ("FASB") as a "Modified Cash" basis of accounting. The FASB/AICPA literature warns the public each version of Modified Cash needs to be explained to third parties relying on what is typically limited to an internal readership who understand what the revenue and expense departures from accrual and cash truly are. Weiss and Bernstein instructed and assisted  CBS in maintaining the internal CBS accounting

books and records using a uniquely defined, modified cash basis but never explained that modified cash basis of accounting to CBS partners including Heintzelman. Neither Weiss nor Bernstein ever stated to the partners that they were using a modified cash basis. Further, they never explained that the use of the modified cash basis was contrary to the terms of the Partnership Agreement.

25. As a CPA, Bernstein has superior education and training in the pronouncements promulgated by the Financial Accounting Standards Board (FASB), which issues the General Accepted Accounting Standards (GAAP). As a CPA, Bernstein was trained to understand and recognize the various bases of accounting approaches and concepts that are allowed under GAAP including the cash basis and the accrual basis of accounting. Heintzelman is not educated or trained to be aware of, or understand, the shortcomings of an alternative basis of accounting known as the "Modified Cash" basis. Upon information and belief, Bernstein participated in the maintenance of the CBS accounting and reporting applying the modified cash basis.

26. The "Modified Cash" basis of accounting is not recommended by FASB. When the "Modified Cash" basis is used by management, its use should be accompanied by descriptive information to alert the readers of its non-conformity with cash or accrual basis of accounting. In other words, the reader should have been informed that the documents did not comply with GAAP pronouncements published by FASB. One of the most glaring examples that CBS used a modified cash basis was that revenues were only reported when invoices were paid (cash basis) and several non-cash (accrual) expenses were posted such as depreciation, amortization, accrued taxes, and accrued loan interest.

27. The Modified Cash basis is contrary to the Partnership Agreement which required that "Gross Income" be accounted for on an accrual basis: "[t]he Gross Income" of the Partnership

8

shall consist of all fees, salaries, proceeds, commissions and other compensation <u>earned or received</u> by any partner…." *See* Partnership Agreement Article VIII, (emphasis added).

28. For a variety of reasons, based upon the income statement and other accounting documents presented to CBS partners during partnership meetings, CBS partners thought that the books were maintained on a Cash Basis of accounting. Part of this misconception was that Weiss and Smith represented that revenues, i.e. client payments were recognized when deposited in the bank. This strongly inferred that CBS was on a Cash Basis accounting system. Weiss, through Bernstein and Fortman, knew or should have known of this misrepresentation.

29. Bernstein and Weiss knew or should have known that recording only cash receipts as "Gross Income" violated the terms of the Partnership Agreement.

30. Despite this knowledge, Weiss filed the CBS tax returns and represented to the Internal Revenue Service that CBS was on a 'Cash Basis' accounting system for the years 2010 through at least 2021.

31. The operations of CBS were supposed to be governed and run under the firm's Partnership Agreement, as amended (the "Agreement"). The Agreement was entered into on or about September 1, 2010, and was amended, effective January 1, 2017. (A copy of the firm's Partnership Agreement, as amended, is attached as Exhibit 1 hereto.)

32. Since the creation of the partnership in 2010, it was always contemplated that Clark, Baird, and Smith would be the first to leave the partnership and would receive the benefit of the Net Profit calculation of Articles VIII and X of the Partnership Agreement

33. On June 1, 2021, Heintzelman ceased to be a partner on June 1, 2021.

CLARKHILL\L5754\462236\271599094.v1

34.     Under Article X of the Partnership Agreement, 60 days after her resignation, Heintzelman was entitled to a calculation of her Net Profit allocation for the period she was a partner at the same percentage rate that she shared in the Net Profit allocation in the preceding year.

B.   When a Partner's interest in the Partnership is terminated, the Partnership must pay to the Partner, or the Partners successor in interest, the following:

1.   Subject to Section E below, his or her capital account as of the date of termination within twenty-four (24) months after the effective date of termination, unless accelerated in the sole discretion of the Executive Committee. In the event of Death, the capital account shall be returned within two (2) months of the date of death; and

2.   His or her Partners draw per Schedule B as then in effect to the end of the calendar month coinciding with the effective date of such Partners ceasing to be a Partner; and such Partner shall be entitled to his or her share of the undistributed net profits or losses of the Partnership through the date of termination in accordance with the same proportion that he or she shared in the net profits and losses during the prior fiscal year. Such undistributed Net Profit shall be paid within ninety (90) days after the termination. Any net losses shall paid by the Partner no later than the effective date of termination in accordance with VIII E above.

(*See* Exhibit 1 attached hereto, page 8).

35.     Article VIII of the Partnership Agreement defines Gross Income as:

A.   The "Gross Income" of the Partnership shall consist of all fees, salaries, proceeds, commissions and other compensation earned or received by any Partner (a) for legal services (but excluding any amounts earned or received by any Partner for legal services rendered before the Partner became affiliated with the Partnership), (b) as a corporate officer or director, teacher, trainer, master, referee, arbitrator or mediator, or (c) from similar or related professional activities shall belong to the Partnership and shall be deposited for and paid over to the Partnership as and when received in exactly the form received (except for endorsement where required). The foregoing shall not be deemed to require any Partner to (i) pay over to the Partnership any amount received by him or her if such payment would be in violation of law, or (ii) turnover to the Partnership gifts of de minimis value or reimbursement for actual out-of-pocket expenses incurred. In addition, the first sentence shall not be deemed to mean or require that (i) fees, commissions, profits or compensation, coming or arising out of any enterprise, activity or entity

> controlled, directly or indirectly, by a Partner, his or her spouse or his or her family, or (ii) commissions or other compensation received for acting as executor, trustee or other fiduciary for the benefit of members of the family of such Partner or his or her spouse belong to the Partnership or be paid to the Partnership; provided, however, that the Partnership receives a fair and reasonable fee for any legal services rendered by the Partnership to such person or entity.

(*See* Exhibit 1 attached hereto, page 3) (emphasis added).

36.    Article VIII of the Partnership Agreement defines Net Profit as:

> B.    The "Net Profit" will be determined by deducting all expenses (including depreciation and amortization) of the Partnership from the Gross Income.

(*See* Exhibit 1 attached hereto, page 4)

37.    Heintzelman filed a complaint in the Circuit Court of Cook County, Illinois County Department, Chancery Division, Case No 2022 CHJ09219 asserting claims for Violation of the Illinois Uniform Partnership Act, 805 ILCS 206/100 and for an accounting.  As part of that proceeding, Heintzelman sought discovery of the books and records of CBS via a document request to CBS and a subpoena on Weiss.  On January 23, 2023, Caren Lederer, an attorney from Golan & Christie, and counsel for both Weiss and CBS represented that she had produced the documents responsive to Plaintiff's document request.  (*See* Exhibit 2; Letter from Caren Lederer letter to Daniel Kinsella dated January 16, 2023, Request No. 11).  The documents referenced in this complaint are business records of both Weiss and CBS received in response to those discovery requests.

38.    Heintzelman made numerous requests to CBS for documents representing "work in progress" and CBS has provided the representation of the firm's work in progress to date of $5,000,00.00.  *See* the Letter from Caren Lederer to Daniel Kinsella dated January 16, 2023, Request No. 11, and CBS Bates No. 005087-005096. Despite this representation and

documentation, Bernstein calculated Heintzelman's Net Profit allocation on a modified cash basis and did not account for any fees earned but not paid before June 30, 2021.

39.     The Partnership Agreement provides for a calculation of the allocation of the net profits to Heintzelman on an accrual basis taking into consideration all "fees, salaries, proceeds, commissions and other compensation *earned or received....*" *See* Article VIII, (A) Accordingly, Net Profit allocation is calculated on an accrual accounting basis and defined as "Gross Income "minus expenses.

40.     Heintzelman is entitled to a Net Profit allocation of 18.0273% of the $5,000,000 identified by CBS and Weiss in their response to the discovery.

41.     Smith directed Bernstein on multiple occasions to calculate the payment of Heintzelman's Net Profit allocation under the terms of the Partnership Agreement. Smith specifically told Bernstein that he wanted to "get this number right." Despite this direction from Smith, Bernstein calculated Heintzelman's allocated "Net Profit" on a modified cash basis. Bernstein did not include in the calculation of Heintzelman's allocated Net Profit" any outstanding accounts receivable or any of the fees and revenues that were earned before June 30, 2021, but not yet billed or received by CBS.

42.     The Partnership Agreement, Articles VIII and X provide for a specific manner of calculation of Net Profit allocation for a departing partner. Further, the Partnership Agreement provides for accrual-based accounting.

43.     Despite the specific provisions of the Partnership Agreement, Weiss and/or Bernstein in conjunction with CBS members and CBS staff, prepared and presented documents to the CBS partners appearing to record gross revenue on a cash basis, *i.e.* when the checks came in.

Indeed, Weiss prepared Heintzelman's K-1, tax return, and the CBS form 1065 tax return and represented to the IRS that CBS was on a cash-based accounting system.

44.     Smith specifically retained Weiss and Bernstein to calculate Heintzelman's 2021 Net Profit allocation.  CBS did so with the intent of having Heintzelman accept that calculation as a full and final settlement of CBS' contractual obligation to pay Heintzelman a Net Profit allocation for 2021 under the Partnership Agreement.   The first check issued to Heintzelman contained the notation: "In full payment for undistributed Net Profits per Art. X, Sec. B, Para. 2 of the Partnership Agreement."   CBS' intent is evidenced by the email correspondence between Smith and Bernstein.

45.     Weiss, Goldman, Fortman, and Bernstein, breached their duty of competence and professionalism when Bernstein failed to follow the instructions in the Partnership Agreement that defined what a departing partner is to receive upon their termination as a partner.  Weiss further failed to provide the appropriate supervision of Bernstein's calculation.

46.     In August 2021, Smith sent Heintzelman's allocated Net Profit calculations to her. At the time, Heintzelman believed Smith was the author of Heintzelman's Net Profit calculation. Because of the nature of the relationship between Heintzelman and Smith, On September 13, 2021, Heintzelman sent a request for the Weiss accountants to certify the calculation by Smith. Heintzelman's request for certification was an attempt to obtain assurances from what she believed to be an objective accounting firm to confirm that Smith accurately calculated Heintzelman's Net Profit allocation. *See* Exhibit 3 CBS 002907-002908.  At the time, Heintzelman also recognized the disparity between the amount of 2021 allocated Net Profits calculation and the Net Profit allocation Heintzelman received in previous years.

CLARKHILL\L5754\462236\271599094.v1

47.     Weiss, Fortman, and Bernstein were negligent and breached their duty of Integrity and Objectivity and other duties under AICPA standards, as stated above when Bernstein accepted Smith's interpretation of the Partnership Agreement and Heintzelman's allocated Net Profits calculation without reference to the Partnership Agreement.

48.     Rather than adhering to their duty of Integrity and Objectivity, on or about September 13, 2021, Bernstein allowed Smith and Golan to misinterpret and mischaracterize Heintzelman's email as a request for an audit certification of financial statements thereby justifying a denial of Heintzelman's request by Bernstein. Bernstein and Weiss further breached their duties by allowing Smith to draft his own written response to Heintzelman's request which was thereafter revised by CBS attorney Golan.  That response was then sent to Heintzelman from Bernstein in an email identifying it as coming from Weiss and Bernstein.

49.     Bernstein's calculation of Heintzelman's estimated partner payout ignored the Partnership Agreement language and erroneously deducted Heintzelman's 2021 draws from Heintzelman's estimated portion of the partnership's undistributed Net Profits as defined in the Partnership Agreement.   For a departing partner, the Partnership Agreement specifically provides for payment of monthly draws <u>and</u> allocated net profits.

50.     Further, the accounting software utilized by Bernstein as part of his duties as a controller for CBS, PC Law, generates the internal Income Statement for CBS but is programmed to use an accounting methodology that is contrary to the accounting methodology defined in the Partnership Agreement.  As a Certified Public Accountant, Bernstein's training and experience in positions of "controller" and his position concerning CBS as "Controller," Bernstein knew or should have known that the accounting methodology CBS was using in its software application

14

was contrary to the methodology required by the Partnership Agreement. Based upon this error in methodology, which Bernstein was responsible for as the CBS controller, Bernstein made a material error by incorporating the PC Law methodology into his estimate of Heintzelman's net profit payment.

51. Further evidence of Weiss' breach is contained in Bernstein's estimated partner payout to Heintzelman when it is compared to the Weiss Tax document prepared CBS 2021 Form 1065, Schedule K-1, Section L, Net Income. Bernstein's estimated payout of Heintzelman's undistributed Net Profits of $32, 270 is materially different from her unallocated Net Profit in her 2021 K-1 prepared by Weiss in the amount of $208,761. In essence, Weiss reported two materially different amounts for Heintzelman's 2021 portion of CBS' undistributed Net Profit, neither of which conforms to the Partnership Agreement.

52. In August 2021, Heintzelman received a statement of undistributed Net Profit for the partial year 2021, $32,270. In the IRS Form K-1 for the tax year 2021, showed her undistributed Net Profit of $208,761.

53. The improper use of the Modified Cash Basis of Accounting affected both the internal income statement circulated to the CBS partners and the tax returns provided to the IRS.

54. In each year, Weiss, Bernstein, and CBS reported to the IRS that CBS maintained its internal accounting data on the Cash Basis. The internal CBS income statement, which Bernstein assisted to prepare with various journal entries to the CBS General Ledger, was maintained using a Modified Cash Basis of Accounting, which the IRS Regulations designates on Page 1, Line H of Form 1065 as "Other (specify)". Weiss, Bernstein, and CBS omitted this data when submitting Form 1065 to the IRS and IL-1065 to the State of Illinois.

CLARKHILL\L5754\462236\271599094.v1

55.    The Partnership Agreement prescribes that the capital accounts will be maintained in conformity with IRS regulations.  (*See* Partnership Agreement Article V*)* IRS Regulations do not permit the use of the Modified Cash basis to report partner capital accounts.   Through 2019, the Accrual or Cash Basis or other disclosed basis was allowed under the IRS regulations. "Prior to the 2020 taxable year, partnerships could report their partners' capital accounts for the taxable year on Schedules K-1, Partner's Share of Income, Deductions, Credits, etc., using one of a variety of methods that are based on different principles (for example, tax basis, generally accepted accounting principles (GAAP), section 704(b) book, or any other method). (*See RS* Notice 2021-13)

56.    By maintaining the CBS books on a Modified Cash basis, the underlying general ledger (Adjusted by Bernstein) used to create the periodic internal Income Statements for the partners and to create the annual IRS Form 1065 (by Weiss) are not accurate or reliable for the years 2010 through 2021. As a result, all reporting of operating income and equity (partner capital accounts) is not accurate or reliable.

57.    Rather than report the capital accounts of CBS in conformity with the Partnership Agreement, which required GAAP Accrual, or a Cash basis (Form 1065, Page 1, Line H), Weiss elected to report capital accounts using a third method, Tax-Affected. Tax-affected capital accounts start with the reported "Modified Cash Basis" Net Income (Form 1065 Line 22 "Ordinary Business Income" which is the same value on Schedule K, Line 1). The Net Income is then adjusted for a series of income and expense items that are subject to alternative treatment to compute adjusted net income that is reported as an "Analysis of Net Income" after considering all of the Schedule K tax adjustments.  Per the Form 1065 Schedule K for the years 2010 through 2019, the reduction in

16

Net Income approximates $1.6 million. This error by Weiss, based on Heintzelman's allocated portion of Tax-Affected Net Income reported on Schedule M-2 and her K-1 section L, exceeds the amount in controversy for purposes of this Court's jurisdiction.

58.     Specifically, violations of AICPA General Standards relating to Sufficient Relevant Data, Planning and Supervision, and Due Professional Care allowed the errors and omissions set forth above to occur. In multiple instances, Weiss knew or should have known, that readily available critical data was not obtained or otherwise not adequately shared between the various Weiss AICPA members to properly prepare the income statements and the tax returns.

59.     Had Weiss complied with the applicable standards, the observed errors and omissions in Heintzelman's Net Profit calculation would not have occurred.

60.     Further, Bernstein knew or should have known that the Partnership Agreement specifically required the accrual basis and defined revenues (gross income) to include fees (earned or received) which is a classic description of accrual-based revenue recognition. Heintzelman viewed Bernstein, who was the controller and/or the CFO as the person most knowledgeable about the accounting and financial aspects of CBS including IRS reporting.

61.     In addition to managing CBS the internal bookkeeping staff, Bernstein provided CPA services to CBS executive committee and CBS' managing partner, Smith, who used the information to compute partner compensation and "Net Profit" allocations as outlined in the CBS Partnership Agreement. Unbeknownst to Heintzelman, Bernstein also maintained a schedule of partner capital account computations separate from the CBS general ledger and separate from the IRS Form 1065 and related partner K-1 schedules.

62.     According to Excel files created by and maintained by Bernstein, this non-general ledger and non-tax returns partner activity schedules were created in 2011 and used through 2021. (Native file CBS_003341).   By remaining silent about failing to adhere to the terms of the Partnership Agreement.  Bernstein participated in the effort to keep the Heintzelman misinformed regarding CBS's annual income and the partners' capital account activity.

63.     CBS partners relied on Bernstein as the person most knowledgeable about GAAP, systems of internal control, and the accurate maintenance and reporting of their partnership capital accounts in conformity with the Partnership Agreement.  Bernstein knew or should have known that the internal books and records were not maintained on a cash basis as was represented to CBS partners and the IRS.

64.     In addition, Weiss also provided tax services to Heintzelman individually.

65.     Weiss owed a duty of care to CBS, to whom Heintzelman was, at all relevant times, a party in privity as an equity partner of CBS, and/or a member of the Executive Committee, and/or a member of the Compensation Committee and/or an Ex Officio member of the Executive Committee.

66.     Heintzelman, and the CBS partners, were also the intended beneficiaries of the accounting, Controllership, CFO, and tax services provided by Weiss and neither Weiss nor CBS notified Heintzelman that she was not an intended beneficiary or not entitled to rely on the services provided by Weiss under 225 ILCS 450/30.1.

67.     In addition, Heintzelman was, individually, a client of Weiss as Weiss prepared and submitted personal tax returns for her.

68.     Heintzelman did not participate in the preparation of any accounting documents and was unable to access accounting documents on the CBS computer systems and was limited to the information prepared by Weiss and Bernstein.

**COUNT I**
**PROFESSIONAL MALPRACTICE – NEGLIGENCE**
**(Against All Defendants)**

69.     Heintzelman incorporates paragraphs 1 through 68 as though fully set forth herein.

70.     Defendants owed a duty of care to Heintzelman as an equity partner of CBS, a member of the Executive Committee, a member of the Compensation Committee, an Ex Officio member of the Executive Committee, and as a personal client of Weiss.

71.     Defendants owed a duty of care to CBS, to whom Heintzelman is a party in privity as an equity partner of CBS, and/or a member of the Executive Committee, and/or a member of the Compensation Committee and/or an Ex Officio member of the Executive Committee.

72.      Defendants owed a duty of care to Heintzelman as a third-party beneficiary of the relationship between Weiss and CBS as Weiss and Bernstein knew or should have known that they were specifically retained to perform Controllership Services, CFO services, and/or calculate Heintzelman's 2021 Net Profit allocation.

73.     As a client, a party in privity with a client, and/or as a third party beneficiary, Defendants owed a duty to exercise due care in the performance of its work for CBS and Heintzelman.

74.     Defendants and Bernstein had a duty of Integrity and Objectivity in performing their Controllership Services, CFO services, and/or calculating Heintzelman's 2021 Net Profit allocation.

CLARKHILL\L5754\462236\271599094.v1

75.     Further, Defendants and Bernstein had a potential conflict of interest in that Bernstein performed controller and tax return functions for both CBS and Heintzelman. Weiss had a duty of competence and professionalism in the calculation of the internal accounting documents and the preparation of IRS Form 1065 and related K-1s and the CBS and Heintzelman tax returns.

76.     To the extent Defendants was serving as both a CFO, and/or controller and/or tax preparer, and/or as a provider of other accounting and tax services, Weiss could not act Objectively as required by their professional responsibilities and the AICPA standards.

77.     Defendants deviated from the required professional AICPA standards in connection with its work for CBS and Heintzelman.

78.     Defendants breached its duty by failing to follow the Partnership Agreement in calculating Heintzelman's Net Profit in 2021.

79.     Defendants breached their duty by failing to keep CBS books and records per the Partnership Agreement.

80.     Defendants breached its duty by failing to prepare the K-1 and tax returns according to the Partnership Agreement including the capital accounts.

81.     As a direct and proximately result of the aforesaid acts of Defendants, Heintzelman has sustained and continues to sustain damages well over $75,000 and this Court's jurisdictional requirement for diversity jurisdiction.

WHEREFORE, Heintzelman demands judgment in her favor and against Defendants for compensatory damages exceeding $75,000.00 plus interests, costs and punitive damages, and, attorneys fees.

CLARKHILL\L5754\462236\271599094.v1

**COUNT II**
**PROFESSIONAL MALPRACTICE – NEGLIGENCE**
**(Against All Defendants)**

82.     Heintzelman incorporates paragraphs 1 through 81 as though fully set forth herein.

83.     Defendants owed a duty of care to Heintzelman as an equity partner of CBS a member of the Executive Committee, a member of the Compensation Committee, a personal tax client, and an Ex Officio member of the Executive Committee.

84.     Defendants owed a duty of care to CBS, to whom Heintzelman is a party in privity as an equity partner of CBS a member of the Executive Committee, a member of the Compensation Committee, and an Ex Officio member of the Executive Committee.

85.      Defendants owed a duty of care to Heintzelman as a third-party beneficiary of the relationship between Weiss and CBS as Weiss and Bernstein knew or should have known that they were specifically retained to calculate Heintzelman's 2021 Net Profits allocation.

86.     As a client, a party in privity with a client, and/or as a third party beneficiary, Defendants owed a duty to exercise due care in the performance of its work for CBS and Heintzelman.

87.     Further, Defendants and Bernstein had a potential conflict of interest in that Bernstein performed controller and tax return functions for both CBS and Heintzelman.  Further, Defendants had a duty of Competence and Professionalism in the calculation of the internal accounting documents and the preparation of the K-1 s and the CBS and Heintzelman tax returns.

88.     To the extent Defendants were serving as both a controller and a tax preparer, Defendants did not act objectively as required by their professional responsibilities and the AICPA Code of Conduct.

CLARKHILL\L5754\462236\271599094.v1

89.     Defendants deviated from the required  AICPA standards in connection with its work for CBS and Heintzelman.

90.     Defendants breached its duty by failing to follow the Partnership Agreement in calculating Heintzelman's Net Profit allocation in 2021. The Partnership Agreement defines, with FASB clarity, all the data needed by Defendants to compute the amount due to a terminated partner. Yet, on August 5, 2021, Weiss allowed Smith to dictate how Heintzelman's Net Profit allocation was calculated and comingled the definition of Net Profit from the Partnership Agreement with the CBS tax return for 2020 reflecting ordinary business income.  Defendants should have structured their unique software work program to account for the terms of the Partnership Agreement.

91.     Defendants breached its duty by failing to keep CBS books and records per the Partnership Agreement.

92.     Defendants breached their duty by failing to prepare the K-1 and tax returns according to the Partnership Agreement including the capital accounts.

93.     Upon information and belief, Defendants potential conflict of interest allowed Smith to dictate Defendants' representations to Heintzelman for purposes of establishing the independence of the calculation of the Net Profit allocation by CBS.  Further, Defendants were aware of the acrimonious relationship between Smith and Heintzelman and, despite that knowledge, allowed Smith to draft representations to Heintzelman regarding the accuracy of Defendants' calculations.

94.     As a direct and proximately result of the aforesaid acts of Weiss, Heintzelman has sustained and continues to sustain damages well over $75,000 and this Court's jurisdictional requirement for diversity jurisdiction.

CLARKHILL\L5754\462236\271599094.v1

WHEREFORE, Heintzelman demands judgment in her favor and against Defendant for compensatory damages exceeding $75,000.00 plus interests, costs and punitive damages, and attorneys' fees.

PRAYER FOR RELIEF:

Plaintiff Heintzelman demands judgment in her favor and against Defendant for:

- Compensatory damages exceeding $75,000.00 including the 18.0273% of the $5,000,000;

- Equitable relief in the form of an accounting of the equity of CBS and the capital accounts of the partners in conformity with the Partnership Agreement (revenue and expenses) and in conformity with General Accepted Accounting Principles from the years 2010 through 2021;

- Interest;

- Costs and attorneys' fees;

- And, any further relief that has been the Court believes is just and appropriate.

Dated: May 18, 2023                                          Respectfully submitted,

                                                             YVETTE HEINTZELMAN


                                                             By: */s/ Daniel V. Kinsella* _____
                                                                   One of her Attorneys

Daniel V. Kinsella – ARDC# 1468472
(dkinsella@clarkhill.com)
CLARK HILL, PLC
Attorneys for Plaintiff
130 East Randolph Street, Suite 3900
Chicago, IL 60601
(312) 985-5900

**CERTIFICATE OF SERVICE**

Daniel V. Kinsella, an attorney, hereby certifies that he caused the above and foregoing Complaint upon counsel of record in this case via the U.S. District Court CM/ECF System on the 18th day of May, 2023.

/s/    *Daniel V. Kinsella*